UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| JORDAN ENTERTAINMENT | ) | |
| GROUP, LLC, JAMES | ) | |
| JORDAN and SEVEN 49 GROUP INC. | ) | |
| Plaintiffs | ) | Civil Action No. |
| v. | ) | |
| | ) | COMPLAINT |
| ENTERTAINMENT ONE US LP | ) | |
| Defendant | ) | |
| | ) | |

_____

**JURISDICTION**

1.     Federal Jurisdiction is predicated on diversity of citizenship and federal question.

2.     Upon information and belief, the amount in controversy exceeds Two Hundred Thousand Dollars ($200,000.00).

**PARTIES**

3.     Jordan Entertainment Group, LLC ("JEG"), is a dissolved New York entity and is an unincorporated entity with an address of 3360 Mountain Song Loop, Murrieta, CA 92562.

4.     Seven 49 Group Inc. ("749") is a California entity with an address of 23360 Mountain Song Loop, Murrieta, CA 92562 and has been assigned all rights from JEG.

5.     James Jordan ("Jordan") is the sole member of JEG and 749. He is a resident of California with an address of 23360 Mountain Song Loop, Murrieta, CA 92562 and has been assigned all rights from JEG.

6.      Entertainment One US LP ("E-One") is a successor in interest to Koch

Entertainment LP is a corporation with business address of 22 Harbor Park Drive, Port

Washington, NY, 11050 and 200 Varick Street, Suite 800 New York, NY 10014.


**FACTS**

7.      The parties entered a Distribution Agreement ("Contract") in 2006 for the

distribution of Plaintiffs' albums. Exhibit "A".

8.      In 2008, the parties terminated their agreement.  Exhibit "B" ("Termination

Agreement").

9.      Despite the termination of the agreement, Defendant continued to sell the

Plaintiffs albums and failed to account to the Plaintiffs.

10.     In particular, Defendant is selling the music on Amazon at

https://www.amazon.com/Jesus-WRIGHT-REVEREND-

TIMOTHY/dp/B000I0QKLA/ref=ntt_mus_ep_dpi_2. See Exhibit "C".

11.     Defendant is also selling the music on Itunes, Spotify and all digital retailers

without report the sales. E-One sold over Fifty Thousand (50,000) of the copies of

Plaintiffs music for approximately Five Hundred Thousand Dollars ($500,000.00) and

did not report the sales to Plaintiffs.  Plaintiffs are due substantial monies from each sale,

equaling in excess of sixty (60) percent of all monies.

12.     E-One was only authorized to sell Plaintiffs products through 2014 pursuant to

paragraph 5 of the Contract and paragraph 3 of the Termination Agreement.

13.      In December 2016, Plaintiffs requested an accounting of all sales from the E-

One.

14.     E-One has not responded to the December 2016 request despite making repeated assurances in 2017 to provide the information in regards to the sale of Plaintiffs' music.

15.     In addition to royalties due Plaintiffs under the Termination Agreement, E-One has unlawfully retained all music publishing money due Plaintiff from the sale of Plaintiffs' albums.

16.     Defendant's failure to report the sales are a deceptive practice. E-One has willfully deprived Plaintiffs of their assets and monies and continue to do so.

17.     Defendant has no legitimate reason to keep the sales information secret from Plaintiffs and no reason to refuse to account to Plaintiffs.

18.     Defendant's actions are designed to hinder the Plaintiffs' business.

## COUNT I- BREACH OF CONTRACT-
## TERMINATION AGREEMENT AND DISTRIBUTION AGREEMENT

19.     Plaintiffs repeat the allegations in paragraphs 1-18.

20.     JEG and E-One entered into a Termination Agreement in 2008 which ended Plaintiffs obligations to provide additional albums to the Defendant.

21.     E-One has failed to account for sales pursuant to the Termination Agreement and Distribution Agreement.

22.     E-One has failed to pay Plaintiff any royalties for several years.

## COUNT II- CONVERSION

23.     Plaintiffs repeat the allegations in paragraphs 1-22.

24.     Plaintiffs' has clear legal ownership or right to possession of the money associated with the sale of Plaintiffs' albums.

25.     E-One's conversion was by a wrongful act or disposition of plaintiff's property rights in the monies due from the sale of numerous albums.

26.     Plaintiffs' have been damaged by the conversion committed by E-One.

27.     Plaintiffs' have been hurt in their business.

## COUNT III- NEGLIGENCE

28.     Plaintiffs repeat the allegations in paragraphs 1-27.

29.     JEG and E-One entered into a Termination Agreement in 2008 which ended Plaintiffs obligations to provide additional albums to the Defendant.

30.     E-One has failed to account for sales pursuant to the Termination Agreement.

31.     E-One has a legal duty to use due care and account to the Plaintiffs.

32.     E-One breached its duty to the Plaintiffs.

33.     There is a reasonably close causal connection between that breach and the Plaintiffs resulting injury of being deprived of its money.

34.     E-One's actions have damaged to Plaintiffs' in their business.

## COUNT IV- COPYRIGHT INFRINGEMENT
## 17 U.S.C. 101-501

35.     Plaintiffs repeat the allegations in paragraphs 1-34.

36.     JEG and E-One entered into a Termination Agreement in 2008 which ended Plaintiffs obligations to provide additional albums to the Defendant.

37.     Plaintiffs have a copyright in the products sold by E-One as indicated in pending United States Copyright Application, case number 1-5514661777.

38.     E-One was only authorized to sell Plaintiffs products through 2014 pursuant to paragraph 3 of the Contract and paragraph 5 of the Termination Agreement.

39.     E-One agreed to cease and desist using Plaintiffs copyrights and products

pursuant to the Contract as follows:

3.   **EXPLOITATION PERIOD:** The exploitation period in respect of each Album hereunder will commence upon the date hereof and will continue for a period of seven (7) years from the last release date for the Artist concerned (the "Exploitation Period"). We will also have a standard six (6) month sell-of period after the expiration of the applicable Exploitation Period.

40.     Plaintiffs last release with E-One was upon information and belief, February 27,

2007, the Reverend Wright album.  E-One agreed to cease and desist using the Plaintiffs

copyrights in September 2014 and have failed to do so.

41.     On August 28, 2017 a letter was emailed on E-One requesting that E-One cease

and desist selling Plaintiffs' music.  E-One did not comply.

42.     On September 5, 2017, a letter was sent via mail to E-One requesting that E-One

cease and desist selling Plaintiffs' music.  E-One did not comply.

43.     E-One breached its duty to the Plaintiffs and continue to sell Plaintiffs music in

violation of the Termination Agreement and federal copyright law.

42.     E-One has unlawfully sold, marketed, reproduced Plaintiffs' copyright and

continues to sell Plaintiffs music and violate Plaintiffs' copyright.

43.     E-One's infringement is willful and deliberate and designed to harm Plaintiffs in
their business.


## COUNT V- PERMANENT INJUNCTION

44.     Plaintiffs realleges paragraphs 1-43 above.

45.     Plaintiffs are entitled to an injunction against the Defendant.

46.     *Grounds.*

Plaintiff will suffer immediate and irreparable injury, loss, or damage if E-One's conduct described above is not enjoined for these reasons:  (1) Defendant is in violation of the Termination Agreement Plaintiff (2) Defendant  are violating Plaintiffs' statutory copyright (3) Plaintiff does not have an adequate remedy at law because the Defendant continue to use Plaintiff's copyright.  Plaintiff has exercised due diligence in prosecuting this claim.  The injury to Plaintiff if the Defendant continues the conduct described above would outweigh any injury the restraining order and injunction might cause the Defendant. An issuance of the restraining order and injunction would not disserve the public interest.

47.     Plaintiff has a likelihood of success on the merits.

48.     Plaintiff seeks a restraining order restraining Defendants' their officers, agents, servants, affiliates, assignees, and employees from directly or indirectly marketing, selling, promoting or distributing Plaintiff's music.

WHEREOFRE, THE PLAINTIFFS DEMAND AS FOLLOWS:

The Plaintiff demands trial by jury and,

1.     Judgment on all counts;
2.     Interest;
3.     Attorneys Fees;
4.     Punitive damages and treble damages; and,
5.     Any other relief this Court deems just and equitable.

JORDAN ENTERTAINMENT
GROUP, LLC. JAMES JORDAN
AND SEVEN 49 GROUP, INC.
By Their Attorneys,


Christopher Brown, NY Bar # 2953891
Brown & Rosen LLC
Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
Dated: September 7, 2017              cbrown@brownrosen.com

# EXHIBIT A



KOCH ENTERTAINMENT LP, 740 BROADWAY, NEW YORK, NY 10003 TEL: 212-353-8800 FAX: 212-228-8886

January 5, 2006

### DEAL MEMORANDUM : JORDAN ENTERTAINMENT GROUP, LLC,
### 14 Argyle Road, Westbury, New York 11590  ("You"; "Your")
### W/KOCH ENTERTAINMENT LP,  740 BROADWAY, NEW YORK, NEW YORK 1003  ("We"; "Us")

In consideration of the mutual promises set forth herein, the parties agree as follows:

## 1.  COMMITMENTS:

### (a) Your Commitment:

(i)  You agree to Deliver to us a minimum of four (4) newly recorded gospel studio albums (collectively, the "Albums") by four (4) separate artists (individually and collectively referred to herein as the "Artists") during the Label Deal Term (as defined below). Promptly after the execution hereof, you agree to Deliver to us one (1) Album each as recorded by the following Artists:

      1. Russell Webster  Company (re: artists "Izzy" and "Darien Dennis"), and
      2. Tony Terry

(Collectively referred to herein as the "Initial Projects")

(ii)  You or your attorney will be responsible for negotiating the applicable Artist contracts, which you agree to consult with us on prior to signature (notwithstanding the immediately preceding sentence, we acknowledge that you entered into agreements regarding the Initial Projects prior to the execution hereof, which therefore will not be subject to such right of consultation). You agree to provide us with a copy of all such recording agreement(s) immediately upon signature by the Artist concerned (in this regard, you agree to provide us with copies of the agreements pertaining to the Initial Projects simultaneously with the execution of this agreement).

### (b) Our Commitment:

(i)  We will be the exclusive exploiter, manufacturer, marketer and distributor throughout the Territory in respect of any and all configurations of the Albums (including the master recordings embodied therein, referred to herein as the "Masters"), now known or hereafter developed, including, without limitation, in respect of DEMD rights (as defined below). We will advance (and pay directly) co-op advertising, marketing and manufacturing costs, to be charged back against Net Proceeds. "DEMD" rights will be defined herein as any transmission, distribution, dissemination or making available ("Distribution") of recordings (or the digitised content thereof) by any means now or hereafter known including, but not limited to, Distribution via telephone (including, without limitation, ring tones, ring backs, realtones, pictones and voicetones), satellite, broadcast, wireless, cable and/or the internet (by any method or means).

(ii)  We agree to provide you with an office/work station and telephone at our Port Washington, New York office at no charge to you.

(c)  Marketing Plans:  We agree to consult with you in respect of the initial phase of each marketing plan hereunder.

2.  LABEL DEAL TERM:   The term of this Agreement will be for one (1) year commencing as of the date hereof (the "Label Deal Term"). We will have the option (the "Option") to extend the Label Deal Term for an additional two (2) year period upon written notice to you at any time prior to the expiration of the initial one year period hereunder. Notwithstanding the immediately preceding sentence, if, as of the date when the Option would otherwise have expired, we have neither exercised the Option nor notified you that we do not wish to exercise the

1

Option, then: (i) you will immediately notify us that the Option has not yet been exercised (an "Option Warning"); (ii) we will be entitled to exercise the Option at any time before receiving the Option Warning or within ten (10) business days thereafter; and (iii) the Label Deal Term will be deemed to have continued until we exercise the Option or until the end of such ten (10) business day period (whichever occurs first).

3.   **EXPLOITATION PERIOD:**  The exploitation period in respect of each Album hereunder will commence upon the date hereof and will continue for a period of seven (7) years from the last release date for the Artist concerned (the "Exploitation Period"). We will also have a standard six (6) month sell-of period after the expiration of the applicable Exploitation Period.

4.   **TERRITORY:**  The Universe ("Territory").

5.   **FUNDING:**

a.   Recording Fund (recoupable):  We will allocate a total overall recording fund for the Artists in the amount of One Hundred Thousand Dollars ($100,000) (the "Recording Fund"), to be allocated and paid as needed in our reasonable business judgment in consultation with you.

b.   Label Overhead Advances (recoupable):  We agree to pay you a general advance in the amount of $100,000. (the "General Advance") per contract year of the Label Deal Term (as defined below), payable $50,000. upon the later of (i) the execution hereof , or (ii) your providing us with copies of the agreements pertaining to the Initial Projects, and $50,000. within six (6) months from the date of contract (for option years, the General Advance will be payable $50,000. upon option exercise and $50,000. within six months of the date of option exercise), with all of the foregoing to be subject to the Kill Fee referred to in paragraph 6 below.

c.   Sales Bonuses (recoupable):  In respect of each project hereunder, you will receive an additional advance (the "Sales Bonuses") in the amount of $25,000.00 upon achieving 35,000 units Soundscan on a per-Album basis, up to a maximum of 105,000 units (i.e., the Sales Bonuses will be capped at $75,000.00 on a per-Album basis).

d.   The Recording Fund, the General Advance and the Sales Bonuses are hereinafter referred to as the "Advances".

e.   In terms of recoupment, the General Advance will be pro-rated equally among the projects. For example, if you present us with 10 projects that are subject to the terms of this agreement, then each such project will be charged with 1/10 of the General Advance (unless we mutually agree to an alternate allocation), and each such project will not be cross-collateralized with the other. If a particular project has not recouped, then the unrecouped portion of the General Advance pertaining to such project will be charged against "Your Fee".

6.   **KILL FEE:**  After the initial six (6) months of each contract year of the Label Deal Term, we will have the option to implement a $10,000. kill fee (the "Kill Fee") and terminate the agreement upon written notice to you.

7.   **RELEASE OBLIGATION:**  Each Album will be released in the USA and Canada within one-hundred, twenty (120) days of Delivery of a finished record in accordance with paragraph 8 below, including, but not limited to, all parts including artwork on disc, all label and publishing credits, on disc, etc., but excluding the months of December and January. Further, Company agrees to exercise its best efforts in securing the release of each Album in the UK, Germany, Japan and Australia, within one hundred eighty days of Delivery of the Album concerned. If Company is unable to secure such release in any of the aforementioned countries, then you will have the right to release the applicable Album through a third party in the country concerned with no further obligations to us with respect to such unreleased Album as well as any subsequent Albums by the Artist concerned in the country concerned.

2

8. **DELIVERY**:   In respect of each Album hereunder, you will deliver to us (i) digital master tapes for the Masters technically and commercially satisfactory for the manufacture of records therefrom, (ii) CD or Zip Disks for the packaging artwork (e.g., photoshop, Illustrator, Quark in TIFF or EPS format); (iii) label copy, liner notes, lyrics and all publishing credits (on disk); (iv) true copies of each mechanical license application for use of each previously released composition embodied in the Masters; for "first use" compositions, you will deliver mechanical license applications along with a valid written confirmation from the respective music publisher and or Harry Fox for our commercial release of that first use composition as embodied in the Masters; (v) true copies of each guest artists' agreement with you and any clearances from each guest artists' respective label (if guest artist is subject to an exclusive recording artist agreement with another entity), if any, (vi) true copies of each sample license, if any, and (vii) any other elements or approvals reasonably requested by us. Any expenses incurred by us in preparing the Masters for the manufacture of phonorecords will be deemed advances against Net Proceeds payable pursuant to this agreement.  It is specifically agreed that if you fail to delivery the artwork for an Album and we create such artwork after your failure to deliver, then we will charge back against your account a $5,000. artwork overhead fee.

9. **NET PROCEEDS:**

(a) For sales of records in the USA, you will receive one hundred (100%) percent of Net Proceeds (as hereafter defined) derived by us from the exploitation of the records and Masters embodied therein.  As used herein "Net Proceeds" will mean all gross revenues received by or credited or accrued to us in connection with the exploitation of the records and Masters embodied therein ("Gross Revenue"), less the following (in the following order):

(i)     KOCH Label Services/Marketing/Distribution Fee - 35% of Gross Revenues;

(ii)    A fee of five percent (5%) fee of Gross Revenues to be paid to you;

(iii)   The Advance(s);

(iv)    Returns and Discounts;

(v)  Expenses: All third party costs and expenses we incur on your behalf for the distribution and marketing for the Album (including co-op costs, manufacturing costs pursuant to Schedule A attached hereto, mechanicals, and all other third party costs and expenses, ); and

(vi)  any funds remaining after the above deductions will be paid to you up to a maximum of ten percent (10%) of  Gross Revenues.

(The fees referred to in subparagraphs 9(a)(ii) and 9(a)(vi) above are collectively referred to herein as "Your Fee")

The Net Proceeds will then be paid one hundred percent (100%) to the Artists.

(b)     For sales of the records in the Territory outside the USA, you will receive sixty (60%) percent of our net receipts from those proceeds less any expenses incurred (with such 60% to be divided 85% to the Artists and 15% to you).

(c)     With respect to Ancillary Uses and any other uses or licenses, we will credit your account with fifty (50%) percent of net royalty receipts (including any advance), or fifty (50%) percent of the net amount received by us, as applicable, from such sales and licenses.

(d)     For sales made via record clubs, we will credit your account with fifty (50%) percent of the net royalty receipts we receive from such club sales.

3

(c)      Your net proceeds provided for in this agreement are inclusive of all royalties payable to the Artists, producers and all third parties for sale of records embodying the Masters and for the use of the Masters. You agree to pay over all amounts due to the artists and producers respecting the Masters and to all other third parties to whom you are obligated to make payments in respect of the Masters.

## 10.  PUBLISHING:

(a) Controlled Compositions.

(i)    As used herein, a musical composition that is written, in whole or in part, by you and/or any producer of the Masters, and/or any person under contract to you or any of your affiliates, or which is owned or controlled, directly or indirectly, in whole or in part, by you and/or any of such parties (hereinafter collectively referred to as "Publisher"), will be deemed to be a "Controlled Composition" for the purposes of this Agreement. Each such Controlled Composition will be set forth on a Schedule attached hereto and incorporated into this Agreement. To the extent that information regarding any Controlled Composition is not available at the time of execution of the Agreement, such information shall be added to the aforementioned Schedule not later than the Mechanical License Delivery Date (as such term is hereinafter defined).

(ii)  You hereby warrant, represent and agree that Publisher has granted (or will grant) irrevocable mechanical and/or synchronization licenses (as the case may be) for you to reproduce each Controlled Composition in both audio and audio-visual products (including, without limitation, phonorecords, DVD'S and DEMD exploitations, and other derivatives, whether now or hereafter known), for distribution in any and all media and by any and all means, whether now or hereafter known (hereinafter collectively referred to as "Controlled Composition Licenses"), which continue for the duration of our exploitation rights under this Agreement. You further acknowledge and agree that we, as your distributor, are a third party beneficiary of such Controlled Composition Licenses and that you, as the Publisher and/or or on behalf of Publisher, have received from us payment in full for such licenses as part of the Advance, the adequacy of which you hereby acknowledge. In any case, this Agreement shall itself be deemed to constitute an irrevocable publishing license in respect of Controlled Compositions hereunder, for which payment in full has been made as part of the Advance, the adequacy of which is hereby acknowledged by you.

(b) Non-Controlled Compositions.

(i)  You further acknowledge that it is your sole responsibility to obtain irrevocable mechanical and/or synchronization licenses (as the case may be) in your name from the owners (or their agents) of all musical compositions embodied in the Masters which are not Controlled Compositions (such other compositions including "samples" contained therein as well as in Controlled Compositions are collectively referred to herein as "Non-Controlled Compositions") and to make all royalty and other payments in connection therewith. Such licenses pertaining to Non-Controlled Compositions shall be referred to herein as "Non-Controlled Composition Licenses". Fully executed copies of all Non-Controlled Composition Licenses on the phonorecords which are the subject of this Agreement will be delivered to us not later than the earlier of (i) the date of Delivery for the Master concerned or (ii) forty-five (45) days prior to the applicable initial street date for the release concerned (referred to as  the "Non-Controlled Composition License Delivery Date").

(ii)  If you do not deliver fully executed Non-Controlled Composition Licenses to us prior to the Non-Controlled Composition License Delivery Date, then we will have the right (but not the obligation), strictly as an accommodation to you and at our sole discretion, to (A) secure such mechanical licenses in your name, on your behalf and on your account (and you hereby grant us a limited  irrevocable power of attorney to do so which shall

4

be deemed coupled with an interest); (B) pay publishing royalties due pursuant to such licenses (which payments shall be deemed Advances against your Net Proceeds otherwise due pursuant to this Agreement); (C) issue publishing royalty statements in connection with such licenses; and (D) provide any other required back office administration services in connection therewith.

(iii) In consideration for our administration services hereunder, you agree to pay us or our designee an administration fee equivalent to fifteen percent (15%) of the amount of any and all publishing royalties paid by us for your account, which fee may be deducted from any and all amounts otherwise due to you. We reserve the right to terminate the foregoing administrative services, in whole or in part, at any time without further notice.

(iv) Publishing royalties in respect of Non-Controlled Compositions shall not exceed (A) in respect of audio releases, 66 2/3% of the minimum statutory rate in effect at the time of Delivery of the Album concerned, multiplied by a factor of five (5); (B) in respect of audio-visual releases, eight cents ($.08) per Non-Controlled Composition embodied therein, multiplied by a factor of five (5); and (C) in respect of combined audio and audio-visual releases, the sum of (A) and (B) multiplied by seventy-five percent (75%). If the applicable publishing royalty cap is exceeded, then we will have the right to deduct any such overage from any monies payable to you hereunder. If the same version of a musical composition recorded hereunder is embodied more than once on a particular release, then we will pay a publishing royalty only once in respect of any such musical composition.

(c)     Without limiting the generality of any other indemnifications contained in the Agreement, you specifically agree to indemnify and hold us and our officers, directors, owners and licensees harmless from and against any loss, cost, damage or expense (including court costs and attorneys fees) arising out of or in connection with any alleged breach of any warranty, representation or covenant contained herein.

11. **ACCOUNTINGS:**

(a) Statements hereunder will be sent by us to you within sixty (60) days following the close of each quarter, together with payment of accrued Net Proceeds, if any, on sales and licenses for which we have received payment by the end of the quarterly accounting period involved. You will be deemed to have consented to all statements rendered by us to you, and they will not be subject to any objection by you for any reason, unless specific objection in writing, stating the basis thereof, is given by you to us within two (2) years from the date the statement is rendered to you (the "Objection Period"). Any action, suit or proceeding relating to any royalty statement rendered hereunder must be commenced by you within one (1) year after expiration of the Objection Period for that statement.

(b) We will maintain books of account concerning the sale, distribution and exploitation of records made hereunder. A certified public account or attorney on your behalf may, at your expense, once per year, examine our books and records to verify the accuracy and completeness of our accountings
to you. Such examinations are to be made at our office, during usual business hours and upon thirty (30) days prior written notice. Our books relating to activities during any accounting period may only be examined as aforesaid during the two (2) year period following service of the statement for that accounting period.

(c) We will have the right to deduct from any amounts payable to you hereunder such portion thereof as may be required to be deducted by the United States Internal Revenue Service and/or any other governmental authority or under any other applicable union or guild agreement, and you will promptly execute and deliver to us such forms and other documents as may be required in connection therewith.

(d) We are authorized to grant free goods (subject to a cap of 15% of units shipped) and any and all discounts, rebates or any other credits in regard to the Albums. Any and all discounts, rebates or credits of any nature are deductible as expenses as per paragraph 9 above. We invoice in our name, but do not assume bad debts. We will be entitled to maintain a reasonable reserve against anticipated returns, rebates and credits. The reserve policy will not exceed twenty-five (25%) percent of Albums sold in the respective accounting period; with respect to sales of singles and other record configurations, such reserves will be held in accordance with our reasonable business judgment. Each reserve will be liquidated evenly in full within twelve (12) months following the period in which

5

the reserve was created. Notwithstanding the foregoing, from time-to-time during the Exploitation Period, the reserve for the respective Album may be adjusted upward in our good faith business judgment in the event the number of Chain (and Christian bookstore) units scanned (USA Chain Soundscan) is disproportional to the number of units shipped in the respective accounting period.

(e)     Returns penalties or disincentives we are able to levy to our accounts are excluded from the above payables calculation and for our sole benefit.

### 12.     **WARRANTIES:**

(a) The parties mutually warrant and represent to one another that they are not under any disability, restriction or prohibition, whether contractual or otherwise, with regard to their respective rights to perform the terms and conditions of this agreement. Without limiting the foregoing, the parties mutually warrant and represent that their prior obligations, contracts and agreements will not interfere in any manner with the warrantor's complete performance of this agreement. You warrant and represent that you own or control the Masters and have the right to grant to us the right to use the Masters in accordance with this agreement, free and clear of any claim of any right by or from any other entity. Furthermore, we will not be required to make any payments of any nature for, or in connection with, the rendition of anyone's services for the Masters, or the acquisition, exercise or exploitation of rights by us pursuant to this agreement, except as specifically provided herein. You warrant and represent that you have obtained all necessary licenses, approvals, consents and permissions, for use of the Masters for the manufacture, sale, exploitation and promotion of records in the Territory in accordance with this agreement.

(b)     You warrant and represent that no material, or our use thereof, will violate any law or infringe upon or violate the rights of any third party. As used herein, "material" includes: (i) all musical compositions and other intellectual property embodied in the Masters (including any re-recording restrictions for any of the compositions) (ii) each name used by you and the Artists in connection with the Masters, and (iii) all other ideas, other intellectual property or elements furnished or selected by either you or the Artists and contained in or used in connection with the Masters or in connection with the packaging, sale, distribution, advertising, publicizing or other exploitation of records embodying the Masters in accordance with this agreement.

### 13.     **INDEMNIFICATION:**

(i) The parties mutually agree to and do hereby indemnify, save and hold the other harmless of and from any and all liability, loss, damage, cost or expense (including reasonable third party attorneys' fees) arising out of or connected with any breach of this agreement or any claim which is inconsistent with any of the warranties or representations made by the indemnitor in this agreement. The indemnitor agrees to reimburse the indemnitee on demand for any payment made or incurred by the indemnitee with respect to any liability or claim to which the foregoing indemnity applies, or, at our election, in lieu of such reimbursement, pending final determination of any claim against us to which indemnity from you may apply, we may withhold sums due you hereunder in an amount reasonably related to the amount of such claim in an interest bearing account. You may post a surety bond, in an amount reasonably related to the claim, from a reputable bonding company assuring us of prompt payment of all losses, expenses and damages (including reasonable third party attorneys' fees and expenses) that we may incur as a result of said claim, and upon our receipt of that bond, we will release the amount so withheld. If no action is filed within nine (9) months following the date on which such claim was first received in writing by us, we will release all sums withheld in connection with such claim. Notwithstanding the foregoing, if after such release by us of sums withheld in connection with a particular claim, such claim is reasserted, then our rights under this sub-paragraph will apply *ab initio* in full force and effect. The indemnitor under this paragraph will have the right to

participate in the defense of any action instituted on a claim for which the indemnitor is responsible, with counsel of the indemnitor's choice and at the indemnitor's expense; however, we will have the right at all times to maintain

6

control of the conduct of the defense.

    (ii)    Notwithstanding anything to the contrary contained herein, we will have the right in its good faith reasonable judgment to settle without your consent any claim involving sums of Five Thousand ($5,000.) Dollars or less, and this indemnity will apply in full to any claim so settled; if you do not consent to any settlement proposed by us for an amount in excess of Five Thousand ($5,000.) Dollars and such refusal to so consent is unreasonable, we will have the right in our good faith business judgment to settle such claim without your consent, and this indemnity will apply in full to any claim so settled, unless you post a surety bond in an amount reasonably related to the claim with a surety reasonably acceptable to us. The surety bond must name of KOCH Entertainment LP as the beneficiary and assure prompt, unconditional payment to Company of all expenses, losses and damages (including costs and reasonable third party attorneys' fees) that Company may incur in connection with said claim.

14. **EXCLUSIVE TERM:** Each Artist's services will be exclusive, and each Artist will agree to not record and/or release non-secular records via any person and/or entity through the period commencing on full signature of our agreement and ending 6 months after initial USA release of the last Album delivered under the deal by that Artist.

15. **LOGO:** We will release Albums hereunder under your logo in a similar size as the KOCH logo. We will provide our manufacturing and UPC code.

16. **ASSIGNMENT:** We will have the right to assign this agreement in whole or in part to a parent company, affiliate, subsidiary or division, or to a third party that acquires substantially all of our assets. You will not have the right to assign this agreement, but will have the right to assign your income interest hereunder to a third party.

17. **NOTICES:** All notices from or to the parties hereto will be in writing and will be sent by personal delivery or courier or by registered or certified mail, return receipt requested. Notices will be deemed to be given when received, and will be sent to the recipient's respective address set forth above in this agreement or pursuant to any written notice of address change, as applicable. A copy of notices from you to us in respect of this agreement are to be sent to our Senior Vice President, Legal & Business Affairs, KOCH Entertainment LP, 740 Broadway, 7th Floor, New York, NY 10003. A copy of notices from us to you in respect of this agreement are to be sent to Minter & Associates, LLC, 5398 E. Mountain Street, Stone Mountain, Georgia 30083-3079 Attention Kendall Minter, Esq.

18. **CHOICE OF LAW:** This agreement will be governed by New York law and the parties agree to the jurisdiction of the New York courts located in New York City in respect of any litigation that may arise hereunder.

19. **MORE FORMAL AGREEMENT:** Until such time that the parties enter into a more formal agreement (if at all), this document, upon signature by both parties, will be deemed a binding agreement between them.

ACCEPTED AND AGREED TO:

KOCH ENTERTAINMENT, LP
By KOCH Entertainment GP LLC (its General Partner)

By: _____
Robert Frank, President

JORDAN ENTERTAINMENT GROUP, LLC

By: _____
James Jordan, President
Tax ID #

7

**Schedule A (as of August 1, 2005)**
**CD, AUDIOTAPE (MC) and LP MANUFACTURING SCHEDULE**

CD Manufacturing: $.80 per Unit, including CD replication, Jewel-Box, assembly, Top Spine, 3 color CD-Label, Shrink-Wrapping, ex-plant; additional CD-Label colors $0.05 per additional color

MC Manufacturing: $0.75 per Unit up to 74:59 playing time calculated at 2x longest program side (additional playing time $0.03 per five-minute increments), including direct print, Norelco, J-Card Insertion, Shrink-Wrapping, ex plant

LP Manufacturing: Single $1.15 per unit, black die cut package, shrink wrapped. Double $2.00 per unit, black die cut package, shrink wrapped.

CD Print (Folders and Inlays) (prices per thousand):

| 4 Over 1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quantity | 2PP | 4PP | 6PP | 8PP | 10PP | 12PP | 16PP |
| 1000 | $217.50 | $259.50 | $327.00 | $379.50 | $433.50 | $487.50 | $558.00 |
| 2500 | $183.00 | $225.00 | $297.00 | $346.50 | $424.50 | $457.50 | $553.50 |
| 5000 | $112.50 | $136.50 | $186.00 | $216.00 | $306.00 | $349.50 | $484.50 |
| 10000 | $100.50 | $108.00 | $151.50 | $175.50 | $247.50 | $288.00 | $402.00 |
| 25000 | $78.00 | $94.50 | $133.50 | $145.50 | $184.50 | $207.00 | $270.00 |
| 50000 | $73.50 | $129.00 | $129.00 | $144.00 | $177.00 | $192.00 | $243.00 |
| 75000 | $72.00 | $85.50 | $127.50 | $139.50 | $174.00 | $190.50 | $238.50 |
| 100000 | $70.50 | $84.00 | $121.50 | $135.00 | $171.00 | $189.00 | $235.50 |
| 200000 | $69.00 | $81.00 | $118.50 | $133.50 | $169.50 | $187.50 | $234.00 |
| 300000 | $67.50 | $79.50 | $117.00 | $132.00 | $166.50 | $184.50 | $231.00 |
| 400000 | $66.00 | $78.00 | $115.50 | $130.50 | $163.50 | $181.50 | $229.50 |
| 500000 | $64.50 | $114.00 | $114.00 | $129.00 | $154.50 | $180.00 | $228.00 |
| | | | | | | | |
| 4 over 4 | | | | | | | |
| Quantity | 2PP | 4PP | 6PP | 8PP | 10PP | 12PP | 16PP |
| 1000 | $577.50 | $636.00 | $684.00 | $787.50 | $846.00 | $913.50 | $1,125.00 |
| 2500 | $252.00 | $295.50 | $364.50 | $417.00 | $511.50 | $568.50 | $697.50 |
| 5000 | $153.00 | $189.00 | $216.00 | $261.00 | $351.00 | $351.00 | $528.00 |
| 10000 | $109.50 | $130.50 | $172.50 | $199.50 | $267.00 | $301.50 | $417.00 |
| 25000 | $91.50 | $112.50 | $148.50 | $178.50 | $204.00 | $217.50 | $276.00 |
| 50000 | $87.00 | $108.00 | $144.00 | $171.00 | $196.50 | $207.00 | $256.50 |
| 75000 | $85.50 | $103.50 | $139.50 | $168.00 | $189.00 | $202.50 | $250.50 |
| 100000 | $82.50 | $102.00 | $135.00 | $166.50 | $187.50 | $198.00 | $243.00 |
| 200000 | $81.00 | $102.00 | $133.50 | $162.00 | $162.00 | $193.50 | $241.50 |
| 300000 | $79.50 | $100.50 | $130.50 | $160.50 | $160.50 | $189.00 | $237.00 |
| 400000 | $79.50 | $99.00 | $129.00 | $159.00 | $159.50 | $187.50 | $235.50 |
| 500000 | $78.00 | $97.50 | $129.00 | $157.50 | $157.50 | $186.00 | $234.00 |

Specifications/Stock:

8

Folder: 100# gloss text coated 2 sides up to 12 pages, 80# gloss text coated 2 sides for 12 pages to 24 pages; Inlay: 100# gloss text coated 2 sides; Folder: 4 ¾ x 4 23/32 Inlay: 5 13/32 x 4 5/8; Folder: 4 over 1 4/C process (one side) 1/C (black for back side); Folder: 4 over 4 4/C

process two sides; Inlay: 4/C process one side

Freight: ex plant / printer; $0.10 per CD & DVD and $0.04 per cassette including Print from plant to KOCH warehouse

Special Packaging:  All other packaging subject to acceptance by KOCH and separate quote

**DVD MANUFACTURING SCHEDULE**

DVD Manufacturing (DVD5): Single sided = $1.60 per Unit, Double Sided = $2.05 including replication, case, assembly, edge label, 2 color DVD-Label, Shrink-Wrapping, Sensormatic Tags (1 out of every 3)

DVD Mastering:  $800

DVD Authoring: $3,000 per disc.  Price includes compression, encoding, basic menu navigation, chapter point navigation, DVD-R Media proof, DLT Master.

DVD Print (Folders and Inlays) (prices per thousand):

| Tray Sheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1000 | 2000 | 2500 | 5000 | 10000 | 15000 | 20000 | 25000 | 50000 | 75000 | 100000 |
| $ 347 | $ 347 | $ 184 | $ 130 | $ 101 | $ 88 | $ 74 | $ 74 | $ 74 | $ 74 | $ 72 |

| 4 over 1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quantity | 8 P P | 12PP | 16PP | 20PP | 24PP | 28PP | 32PP |
| 1000 | $ 652 | $ 850 | $ 1,037 | $ 1,166 | $ 1,274 | $ 1,444 | $ 1,615 |
| 2000 | $ 652 | $ 850 | $ 1,037 | $ 1,166 | $ 1,274 | $ 1,444 | $ 1,615 |
| 2500 | $ 337 | $ 439 | $ 542 | $ 612 | $ 675 | $ 767 | $ 859 |
| 5000 | $ 232 | $ 304 | $ 382 | $ 430 | $ 542 | $ 542 | $ 698 |
| 10000 | $ 176 | $ 236 | $ 295 | $ 337 | $ 373 | $ 425 | $ 477 |
| 15000 | $ 158 | $ 211 | $ 265 | $ 304 | $ 336 | $ 385 | $ 432 |
| 20000 | $ 149 | $ 198 | $ 252 | $ 286 | $ 319 | $ 364 | $ 410 |
| 25000 | $ 142 | $ 193 | $ 243 | $ 277 | $ 313 | $ 351 | $ 398 |
| 50000 | $ 133 | $ 178 | $ 223 | $ 257 | $ 293 | $ 331 | $ 373 |
| 75000 | $ 128 | $ 173 | $ 220 | $ 252 | $ 288 | $ 322 | $ 362 |
| 100000 | $ 128 | $ 171 | $ 220 | $ 248 | $ 284 | $ 319 | $ 358 |

| 4 over 4 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quantity | 8 P P | 12PP | 16PP | 20PP | 24PP | 28PP | 32PP |
| 1000 | $ 1,073 | $ 1,566 | $ 2,059 | $ 2,552 | $ 3,046 | $ 3,539 | $ 4,000 |
| 2000 | $ 1,073 | $ 1,566 | $ 2,059 | $ 2,552 | $ 3,046 | $ 3,539 | $ 4,000 |
| 2500 | $ 517 | $ 747 | $ 983 | $ 1,215 | $ 1,447 | $ 1,681 | $ 1,913 |
| 5000 | $ 331 | $ 477 | $ 621 | $ 769 | $ 914 | $ 1,058 | $ 1,206 |
| 10000 | $ 236 | $ 337 | $ 439 | $ 542 | $ 644 | $ 747 | $ 848 |
| 15000 | $ 202 | $ 292 | $ 376 | $ 464 | $ 553 | $ 639 | $ 725 |
| 20000 | $ 187 | $ 266 | $ 347 | $ 427 | $ 506 | $ 599 | $ 666 |
| 25000 | $ 178 | $ 252 | $ 328 | $ 403 | $ 477 | $ 553 | $ 629 |
| 50000 | $ 158 | $ 223 | $ 292 | $ 358 | $ 425 | $ 490 | $ 558 |
| 75000 | $ 153 | $ 218 | $ 279 | $ 342 | $ 407 | $ 472 | $ 533 |
| 100000 | $ 149 | $ 211 | $ 274 | $ 337 | $ 398 | $ 459 | $ 520 |

DIGIPAK MANUFACTURING SCHEDULE (ALL FORMAT)

The Following Schedule is for Digipak manufacturing and insertion charges.  These charges are not inclusive of the cost of the actual disc, which are as follows:

Audio CD - $.75     DVD5 - $1.30     DVD9 $1.70

Insertion Charge – $.10 per disc.

Standard Digipak Charges, 4 Color with shrinkwrap, black or white tray.  Prices are per 1000.

|        | 4 panel  | 6 panel  | 8 panel    |
|--------|----------|----------|------------|
| 2500   | $ 1,000  | $ 1,400  | $   1,600  |
| 5000   | $   700  | $ 1,000  | $   1,200  |
| 10000  | $   600  | $   750  | $     900  |
| 15000  | $   500  | $   700  | $     800  |
| 20000  | $   475  | $   600  | $     775  |
| 35000  | $   450  | $   575  | $     750  |
| 50000  | $   425  | $   550  | $     725  |
| 100000 | $   400  | $   525  | $     700  |

Standard Upcharges.  Prices are per 1000.

|        | Standard Pocket | Diagonal Pocket | Clear Tray | Second Tray | Tipped in Book | 1/C Backside | 4/C Backside | UV, Gloss, Matte Coating |
|--------|-----------------|-----------------|------------|-------------|----------------|--------------|--------------|--------------------------|
| 2500   | $   300         | $   130         | $   40     | $ 240       | $   150        | $   240      | $   350      | $   200                  |
| 5000   | $   250         | $   120         | $   40     | $ 240       | $   130        | $   140      | $   250      | $   160                  |
| 10000  | $   150         | $   100         | $   40     | $ 220       | $   120        | $    80      | $   200      | $   120                  |
| 15000  | $   150         | $    90         | $   40     | $ 220       | $   100        | $    70      | $   180      | $   100                  |
| 20000  | $   150         | $    80         | $   40     | $ 220       | $   100        | $    70      | $   160      | $   100                  |
| 35000  | $   150         | $    70         | $   40     | $ 200       | $   100        | $    60      | $   150      | $    80                  |
| 50000  | $   140         | $    60         | $   40     | $ 200       | $   100        | $    40      | $   140      | $    80                  |
| 100000 | $   120         | $    40         | $   40     | $ 200       | $   100        | $    20      | $   120      | $    40                  |

Freight: ex plant / printer; $0.10 per CD, VHS and DVD and $0.04 per cassette including Print from plant to KOCH warehouse

Special Packaging:  All other packaging subject to acceptance by KOCH and separate quote

10

# EXHIBIT B



ENTERTAINMENT

KOCH ENTERTAINMENT LP, 740 BROADWAY, NEW YORK, NY 10003 TEL: 212-353-8800 FAX: 212-228-8886

Tuesday, August 19, 2008

JORDAN ENTERTAINMENT GROUP, LLC
14 Argyle Road
Westbury, New York 11590

Gentleperson(s):

Reference is hereby made to the Marketing/Pressing & Distribution Label Services agreement (the "Agreement") between Koch Entertainment, LP ("KOCH") and Jordan Entertainment Group, LLC ("Grantor"), dated as of January 5, 2006, in full force and effect as of the date hereof. Notwithstanding anything to the contrary expressed or implied in the Agreement or otherwise, the following shall constitute the further understanding between the parties:

1.    Pursuant to Grantor's request to KOCH, Grantor and KOCH hereby agree that contingent upon (A) the full execution of this agreement, and (B) KOCH's payment to Grantor the sum of Twenty Five Thousand ($25,000.00) Dollars ("Termination Fee") within fourteen (14) days of full signature of this agreement, the Label Deal Term of the Agreement shall be deemed terminated as of the date hereof.

2.    In consideration of the Termination Fee and releases contained herein, Grantor, for itself, and on behalf of its legal successors and assigns, personal representatives, partners, members, agents, affiliates, subsidiaries, attorneys, employees and predecessors-in-interest (the "Grantor Releasors"), does hereby absolutely, fully and forever release, relieve, waive, relinquish and discharge KOCH and all of KOCH's respective predecessors-in-interest, successors, assigns, assignors, heirs, executors, administrators, personal representatives, members, officers, directors, agents, including KOCH's servants, employees, attorneys, representatives, partners, subsidiaries, corporate entities owned and/or controlled by KOCH, in which KOCH's affiliates and designees, and each of them, as applicable (collectively, the "KOCH Releasees"), of and from any and all manner of action or actions, suits, debts, liabilities, demands, claims, causes of action, obligations, costs, expenses, sums of money, controversies, attorneys' fees, damages, accounts, reckonings, judgments, losses and liens of every character, nature or kind whatsoever, whether known or unknown, suspected or unsuspected, matured or contingent, in law or in equity, which Grantor or the Grantor Releasors, and each of them, now owns or holds, or at any time heretofore ever owned or held, or could, shall or may hereafter have, own or hold against KOCH or the KOCH Releasees that arises out of or in any way is connected with the Agreement from the beginning of time to the date this agreement is executed. Grantor acknowledges that it intends this agreement to be a full and final accord and satisfaction and release of every matter referred to in this paragraph 2. Notwithstanding the foregoing, nothing contained in this agreement will affect KOCH's obligation to account to Grantor and pay Grantor its share of Net Proceeds (if any) under the Agreement.

3.    In consideration of the releases provided contained in paragraph 2 above, KOCH hereby releases and discharges Grantor from any future obligations under the Agreement, including, but not limited to, the obligation to record and deliver further Albums under the Agreement. Notwithstanding anything to the contrary contained herein, nothing contained in this Agreement shall

1

affect those obligations, that either by their terms or by their nature would survive the termination of the terms of the Agreement (i.e. warranties, indemnities, etc.).

4.       As further consideration to Grantor hereunder and in addition to the Termination Fee payable to Grantor hereunder, on Grantor's behalf, KOCH agrees to pay Grantor's attorney Serling, Rooks & Ferrara LLP ("Attorney") the sum of Seven Thousand Five Hundred ($7,500.00) Dollars ("Attorney's Fee"), representing Grantor's attorney's fees relating to this agreement, simultaneous with our payment to Grantor hereunder. Our compliance with this authorization will constitute an accommodation to Grantor alone; Attorney is not a beneficiary of it. All payments to Attorney under this agreement will constitute payment to you and we will have no liability whatsoever by reason of any erroneous payment or failure to comply with this authorization. You will indemnify and hold us harmless against any claims asserted against us and any damages, losses or expenses incurred by us by reason of any such payment or otherwise in connection herewith.

5.       KOCH hereby retains all rights in any and all Albums and Masters previously Delivered by Grantor to KOCH as per the terms of the Agreement. Notwithstanding the foregoing, all rights in and to the Album entitled "Eyes on the Prize" by the recording artist p/k/a Angela Spivey, Delivered by Grantor to KOCH as per the terms of the Agreement, will revert to Grantor.

6.       Grantor understands and agrees that the release set forth above includes claims of every nature and kind, whether known or unknown, suspected or unsuspected existing as of the date hereof. Grantor further acknowledges that Grantor may hereafter discover facts different from, or in addition to, those which Grantor now knows or believes to be true with respect to any release herein made, and agrees that every release herein made is now and will remain effective notwithstanding such different or additional facts or the discovery thereof.

Grantor expressly consents that the general release set forth herein shall be given full force and effect in accordance with each and all of its express terms and provisions, including those terms and provisions relating to unknown and unsuspected claims, demands and causes of action, if any, to the same effect as those terms and provisions relating to any other claims, demands and causes of action hereinabove specified.

7.       Grantor represents and warrants that Grantor will have the full right and power to enter into this agreement and to fully perform all of the terms and conditions hereof. Neither this agreement nor the fulfillment thereof by Grantor infringes upon the rights of any third party. Grantor has the right to grant the rights herein granted and have not assigned any of Grantor's rights or interest under the Agreement.

8.       Grantor is a corporation in good standing, duly organized and existing under the laws of the State of New York.  The party executing this agreement on Grantor's behalf is Grantor's authorized representative, duly authorized to sign on Grantor's behalf.

9.       Grantor agrees to and do hereby indemnifies, saves and holds KOCH harmless of and from any and all liability, loss, damage, cost or expense (including reasonable third party attorneys' fees) arising out of or connected with any breach or alleged breach of this agreement or the Agreement or any third party claim which is inconsistent with any of the warranties or representations made by Grantor in this agreement or the Agreement, provided the said claim has been settled with Grantor's prior, written consent, not to be unreasonably withheld or delayed, or has been reduced to final judgment by a court of competent jurisdiction, and agree to reimburse KOCH on demand for any payments made or incurred by or for KOCH with respect to any liability or claim to which the foregoing indemnity applies.  Notwithstanding anything to the contrary contained herein, KOCH shall

2

have the right to settle without Grantor's consent any claim involving sums of Five Thousand ($5,000.00) Dollars or less, and this indemnity will apply in full to any claim so settled; if Grantor does not consent to any settlement proposed by KOCH for an amount in excess of Five Thousand ($5,000.00) Dollars, KOCH will have the right in KOCH's good faith business judgment to settle such claim without Grantor's consent, and this indemnity will apply in full to any claim so settled, unless Grantor posts a surety bond in an amount reasonably related to the claim with a surety reasonably acceptable to KOCH. The surety bond must name KOCH as the beneficiary and assure prompt, unconditional payment to KOCH of all expenses, losses and damages (including costs and reasonable third party attorneys' fees) that KOCH may incur in connection with said claim. Pending final determination of any claim against KOCH to which indemnity from Grantor may apply, KOCH may withhold sums due to Grantor hereunder in an amount reasonably related to the amount of such claim unless Grantor obtains a surety bond, in an amount reasonably related to the claim, from a reputable bonding company assuring KOCH of prompt payment of all losses, expenses and damages (including reasonable third party attorneys' fees and expenses) that KOCH may incur as a result of said claim, and upon KOCH's receipt of that bond, KOCH will release the amount so withheld. If no action is filed within one (1) year following the date on which such claim was first received by KOCH, KOCH will release all sums withheld in connection with such claim, unless KOCH, in KOCH's reasonable business judgment, believes an action will be filed within an additional period of six (6) months. Notwithstanding the foregoing, if after such release by KOCH of sums withheld in connection with a particular claim, such claim is reasserted, then KOCH's rights under this paragraph will apply *ab initio* in full force and effect.

10.    THIS AGREEMENT IS ENTERED INTO IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND TO BE WHOLLY PERFORMED THEREIN (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES UNDER NEW YORK LAW). THE PARTIES AGREE THAT ANY ACTION, SUIT OR PROCEEDING BASED UPON ANY MATTER, CLAIM OR CONTROVERSY ARISING HEREUNDER OR RELATING HERETO SHALL BE BROUGHT SOLELY IN THE STATE COURTS OF OR THE FEDERAL COURT IN THE STATE AND COUNTY OF NEW YORK; EXCEPT THAT IN THE EVENT KOCH IS SUED OR JOINED IN ANY OTHER COURT OR IN ANY OTHER FORUM IN RESPECT OF ANY MATTER WHICH MAY GIVE RISE TO A CLAIM BY KOCH HEREUNDER, THE PARTIES HERETO OTHER THAN KOCH CONSENT TO THE JURISDICTION OF SUCH COURT OR FORUM OVER ANY CLAIM WHICH MAY BE ASSERTED BY KOCH THEREIN. THE PARTIES HERETO IRREVOCABLY WAIVE ANY OBJECTION TO THE VENUE OF THE ABOVE-MENTIONED COURTS, INCLUDING ANY CLAIM THAT SUCH ACTION, SUIT OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

11.    This agreement shall be binding on and inure to the benefit of the respective parties, their legal representatives, successors and assigns.

12.    The invalidity, illegality or unenforceability of any provision hereof shall not affect the validity of any other provision of this agreement. This agreement constitutes the entire agreement among the parties with respect to the subject matter hereof, and no modification, waiver, termination, discharge or amendment of this agreement shall be binding upon KOCH unless confirmed by an instrument in writing which specifically refers to this agreement and is signed by Grantor or by an authorized representative of Grantor hereunder. Any such instrument signed by KOCH shall be signed by the Senior Vice President, Business and Legal Affairs.

3

13.     All notices from or to the parties hereto will be in writing and will be sent by personal delivery, national courier or by certified mail, return receipt requested. Notices will be deemed to be given when received, and will be sent to the recipient's applicable address set forth above in this agreement or pursuant to any written notice of address change, as applicable. A copy of notices from Grantor to KOCH pertaining to this agreement will be sent to the Senior Vice President, Business and Legal Affairs, KOCH Entertainment LP, 740 Broadway, 7th Floor, New York, NY 10003. A copy of noticed from KOCH to Grantor pertaining to this agreement will be sent to Serling Rooks and Ferrara, LLP, 119 5th Avenue, 3rd Floor New York, NY 10003. Attention: Joe Serling, Esq., provided that failure to send a copy of notices to shall not be deemed a material breach of this Agreement

14.     All capitalized terms not defined herein shall have the same meaning as set forth in the Agreement.

15.     The parties hereto agree to maintain the confidentiality of the terms and subject matter of this agreement and to refrain from disclosing same to any third party provided: (a) either party shall have the right to disclose such terms to its parents, subsidiaries and/or affiliated companies, and/or to their officers, directors, employees and representatives (collectively, the "Representatives") solely for the purpose of exercising the rights or obligations hereunder and/or to administer this agreement; (b) if either party or any of its Representatives becomes legally compelled (by deposition, interrogatories, requests for documents, subpoena, civil investigative demand or similar process) to disclose any such terms, such disclosure pursuant thereto shall not be deemed a breach of this paragraph; and (c) each party hereby warrants and represents that the entering into of this confidentiality provision is not for the purposes of impairing or otherwise interfering with any third party's rights, nor shall it so impair or interfere with any such rights. Grantor further agrees to refrain from publicizing any disparaging statements, either directly or through Grantor's respective representatives, concerning KOCH, this agreement, the Agreement or the subject matter underlying this agreement or the Agreement. KOCH agrees to refrain from publicizing any disparaging statements, either directly or through KOCH's respective representatives, concerning Grantor, the Agreement or the subject matter underlying this agreement or the Agreement.

16.     This agreement shall not be construed against either party as the drafter, it being agreed that this agreement has been drafted jointly by the parties.

Very truly yours,

KOCH Entertainment LP,
By KOCH Entertainment GP LLC (its General Partner)

By: _____
Robert Frank, President

AGREED & ACCEPTED:

JORDAN ENTERTAINMENT GROUP, LLC

By: _____
James Jordan, an authorized signatory

4

# EXHIBIT C





14   **The Best Thing (Reprise)**

Sold by Amazon Digital Services LLC. Additional taxes may apply. By placing your order, you agree to our Terms of Use.

## Product details

**Audio CD** (February 27, 2007)

**Number of Discs:** 1

**Label:** Koch Records

**ASIN:** B000I0QKLA

**Average Customer Review:** ★★★★☆ (26 customer reviews)

**Amazon Best Sellers Rank:** #82,755 in CDs & Vinyl (See Top 100 in CDs & Vinyl)
   #1103 in CDs & Vinyl > Gospel
   #1899 in CDs & Vinyl > Christian > Pop & Contemporary
   #66876 in CDs & Vinyl > Pop

If you are a seller for this product, would you like to suggest updates through seller support?

## Amazon's Rev. Timothy Wright Store

› Visit Amazon's Rev. Timothy Wright Store



**Jesus Jesus Jesus**
Available from these sellers.

## Customer reviews

⭐⭐⭐⭐⭐ 26
4.6 out of 5 stars ▾

| | | |
|---|---|---|
| 5 star | | 77% |
| 4 star | | 15% |
| 3 star | | 4% |
| 2 star | | 4% |
| 1 star | | 0% |

See all verified purchase reviews ›

Share your thoughts with other customers

Write a customer review

### Top customer reviews

⭐⭐⭐⭐⭐ **Five Stars**
By girlinntx on May 11, 2017
Format: Audio CD   Verified Purchase
good

Comment    Was this review helpful to you?   Yes   No   Report abuse

⭐⭐⭐⭐⭐ **Five Stars**
By Amazon Customer on July 18, 2017
Format: Audio CD   Verified Purchase
Beautiful sounds.

Comment    Was this review helpful to you?   Yes   No   Report abuse



Jesus Jesus Jesus
Available from these sellers.

See all verified purchase reviews ›

**Top customer reviews**

⭐⭐⭐⭐⭐ **Five Stars**
By girllinntx on May 11, 2017
Format: Audio CD | Verified Purchase

good

Comment | Was this review helpful to you? [Yes] [No]  Report abuse

⭐⭐⭐⭐⭐ **Five Stars**
By Amazon Customer on July 18, 2017
Format: Audio CD | Verified Purchase

Beautiful sounds.

Comment | Was this review helpful to you? [Yes] [No]  Report abuse

⭐⭐⭐☆☆ **Great Music**
By LadyDee on December 3, 2012
Format: Audio CD | Verified Purchase

As always, I am definitely pleased with this cd. Rev. Timothy Wright always produced traditional gospel music that stirs the soul. Thank you.

Comment | Was this review helpful to you? [Yes] [No]  Report abuse

⭐⭐⭐⭐⭐ **Five Stars**
By KR on September 1, 2016
Format: Audio CD | Verified Purchase

Came As Stated, Brand, no holes. Speedy delivery :)



Jesus Jesus Jesus
Available from these sellers.

★★★★★ **Five Stars**
By KR on September 1, 2016
Format: Audio CD | Verified Purchase
Came As Stated, Brand, no holes. Speedy delivery :)

Comment | Was this review helpful to you? | Yes | No | Report abuse

★★★★☆ **Four Stars**
By Susie T. on October 2, 2016
Format: Audio CD | Verified Purchase
Love to hear his music

Comment | Was this review helpful to you? | Yes | No | Report abuse

★★★★★ **Rev. Timothy Wright**
By Veronica J. Victory on June 25, 2014
Format: Audio CD | Verified Purchase
I had to have this CD after he and his family died in that tragic automobile accident. I can listen to him sing for hours because you can tell
believed what he was singing about.

Comment | Was this review helpful to you? | Yes | No | Report abuse

★★★★★ **The Reverend Timothy Wright**
By Christine Daniels Touris on April 18, 2014
Format: MP3 Music | Verified Purchase
I was very thankful I could get this recording and to get it in an outstanding condition. Thank you for the refreshing memories.



Available from these sellers.

Comment | Was this review helpful to you? [Yes] [No] Report abuse

⭐⭐⭐⭐⭐ The Reverend Timothy Wright
By Christine Daniels Touris on April 18, 2014
Format: MP3 Music | Verified Purchase

I was very thankful I could get this recording and to get it in an outstanding condition. Thank you for the refreshing memori

Comment | Was this review helpful to you? [Yes] [No] Report abuse

⭐⭐⭐⭐⭐ GOTTA LOVE IT
By Jei on January 11, 2012
Format: Audio CD | Verified Purchase

I'm a long time fan of Rev Timothy Wright. This cd that I ordered is a must-have. I placed the order and it came quickly. The c
condition which that is a pet peeve of mine if it isn't in great condition.

Comment | Was this review helpful to you? [Yes] [No] Report abuse

See all verified purchase reviews (newest first) ›

[ Write a customer review ]

What other items do customers buy after viewing this item?